Good morning, your honors. I'm Claudia Kilbreath with Short Crestman & Burgess, and I represent the appellant Hugh Hardage. I'd like to reserve five minutes for rebuttal. As Judge Wallace stated during the last argument, there is a very high standard in employment discrimination cases. Very little is required of the non-moving party, specifically because there are issues of intent and motivation that can only be resolved by a jury after weighing credibility and viewing all of the evidence. Well, that doesn't mean that summary judgment is never appropriate in employment cases. That is correct. Because a district court judge has authority under the Supreme Court cases. Anderson, you could look at the evidence and you could say, you know, even taking all the evidence that's presented, no reasonable trier of fact could ever find intent. That's certainly the case. And the problem in this situation is that district court did not view the facts in the light most favorable to Mr. Hardage. The district court ignored many facts. The district court made inferences and made credibility determinations. Had the district court taken all the facts in the light most favorable to Mr. Hardage, summary judgment would not have been granted. And it's our position that taking the facts in the light most favorable to CBS as a matter of law Well, let's take one example for just a moment. One of the claims is that he suffered a constructive discharge. Correct. You take the evidence in light most favorable to your client. Why does that add up to a constructive discharge? Well, in suitors, the Supreme Court held that a constructive discharge, if it's precipitated by some official action, is a tangible job detriment. What was the tangible action here? And the tangible job detriment in this case is a combination of three things. It is the hostile work environment. It is the disciplinary notice that he was provided right before he quit. And it's the constructive discharge itself. In Ford v. General Motors, granted it was a Sixth Circuit case from 2000, the court held that those three factors, a hostile work environment, an unwarranted discipline, and a constructive discharge could together be viewed as a tangible job detriment. What's the name of the case? Ford v. General Motors. I believe it's from 2000. And in Ray v. Henderson, a Ninth Circuit case, the court held that a hostile work environment can constitute an adverse employment action. And in Ellison v. Brady, the Ninth Circuit held that the mere presence of the harasser alone can constitute an adverse employment action. So if you look at the facts of what transpired in this case, where Mr. Hartage was subjected to explicit, overt sexual advances from Kathy Sparks that he repeatedly rejected, and at the point where she finally understood he had engaged in protected conduct in March of 2001, when he informed her at the Kingfish restaurant that he had made a complaint of sexual harassment against him, she then began a campaign of the hostile comments, singling him out in meetings, putting him out of his job, all of that in conjunction with the disciplinary notice that she had provided. And in the case that she was involved in, viewing the facts in the light most favorable to Mr. Hartage, we believe, would enable a jury to conclude that he was constructively discharged. Did he follow up with Falcone? Yes, he did. And I think it's very illustrative that the district court, in its rendition of the facts, stated that after he had the, what it called the meeting with Mr. Falcone, which was actually Mr. Hartage driving Mr. Falcone to the airport and them chit-chatting during that period of time, the district court testified that he never talked to Mr. Falcone again after that. But in fact, Mr. Hartage's testimony is that he called Mr. Falcone one time and got his voicemail. He called a second time and was told that Mr. Falcone had left the company. He called a third time when he quit and actually spoke to Mr. Falcone and told Mr. Falcone that he had quit because of Kathy Sparks. That's nowhere to be found in the district court's rendition of the facts. Well, if I understand the facts, Falcone came to Seattle to see him. Is that right? No, Your Honor, that's actually incorrect. Mr. Falcone was told by Mr. Radjuski that there had been a sexual harassment complaint, and Mr. Radjuski wanted Mr. Falcone to look into it. Mr. Falcone testified that he was going to be in Seattle for some other matter, so he would just meet with Mr. Hartage then. No, it's true. He did come to Seattle. He came and he saw Hartage. He was in Seattle on some other matters. Apparently, he didn't have time because he met with Mr. Hartage in the car on the way to the airport. Is that significant that he met him in the car? I mean, you met that twice. Your Honor, I really think it is. They've got to meet someplace other than the car? I think it is significant because what the defendant is complaining of is that Mr. Hartage unreasonably failed to complain. And just taking that specific instance, he was in a situation where it was not an interview. Mr. Falcone did not sit down with him in a room, make him feel comfortable, ask him, okay, I want to know everything that happened here. I want to talk to you. It was a meeting where Mr. Falcone testified. Initially, there was five to ten minutes of chit-chat about the weather, and then he said, well, Mr. Hartage, what can I do for you? Did your guy tell Falcone that he didn't need to pursue anything any further at that point? Mr. Hartage told Mr. Falcone that Kathy Sparks was making sexual advances which he had rejected. Those words are specifically in the record. Right. And Falcone said, well, do you want me to do anything about it? And your guy said no. Is that right? Mr. Falcone Do I have that right? In part. And I just want to elaborate on that. But, yes, Mr. Falcone gave Mr. Hartage three options. And, again, this was in a very short time span when Mr. Falcone had not sufficiently explored everything that happened. There wasn't time. He didn't ask the questions of Mr. Hartage. But Mr. Falcone did understand, he testified, that he understood Mr. Hartage was complaining that Kathy Sparks was hitting on him, and it made him feel uncomfortable. Did Falcone call him two weeks later? Falcone did call him two weeks later. And your guy, again, declined to file a formal complaint with Falcone? He said Mr. Falcone called him two weeks later, and Mr. Hartage testified that he told him nothing has changed. But to back up, Mr. Falcone, in the car, gave Mr. Hartage three options. He said, well, you can do nothing, or you can try to talk to Kathy Sparks nicely, one-on-one, and see what happens, or you can have me talk to her and tell her to, quote, lay back a little bit. Not one of the options that Mr. Falcone gave Mr. Hartage is what, in fact, the law requires, which is that CVS, because it was on notice of sexual harassment, do an investigation. And the Nichols v. Azteca case is directly on point, although the district court dismissed it because it contended that the facts were different. It is directly on point. There, the employee did not complain in accordance with company policy. He didn't go to the area manager, and he did not go to the EEO officer. He told some managers that he was being sexually harassed at work. Could you go back with me just a minute so I can put this argument into context? As I understand it correctly, if there's a tangible employment action, then we don't get into the separate affirmative defense. Correct. And we only get to the argument you're pursuing now if there is a tangible employment action. It takes a different process. Now, you cited a Sixth Circuit's case indicating that there can be a tangible employment action based upon sexual harassment. But I want to call to your attention Montero, a Ninth Circuit case, and I'm sure you're familiar with Montero, that the plaintiff was not constructively discharged in part because of the sexual harassment behavior, because it had ceased three to four months before the plaintiff's resignation. Now, Carthage concedes the last time Sparks made inappropriate sexual advancements was at the Kingfish Cafe, and that was five months. Now, our circuit has already decided that there's no tangible employment action when the sexual harassment ceased three to four months before. This ceased five months before. So aren't we in the position that there isn't tangible employment action in this case? Your Honor, I really don't concede that there is not tangible job detriment. And the reason I started getting into the affirmative defense is because even if there wasn't, as a matter of law, we contend that CBS should not be entitled to utilize the affirmative defense. But getting back to your question, in Montero, the plaintiff did not resign until after her supervisor had been fired and another individual who had sexually harassed her had been disciplined. And the court put weight on that, that she had been shown by the company, by the fact that one person had been fired and the other person had been disciplined, that the company would and did take appropriate corrective action. Here, Mr. Hartage ---- Do you think Montero is distinguishable on that basis? Well, I believe it is because Mr. Hartage made a complaint and nothing happened. CBS did not do anything. Had Kathy Sparks been fired, Mr. Hartage would probably still be working there today. And, again, that is a determination that the jury should have been allowed to make. So, yes, I believe that Montero is distinguishable on that basis. With respect to the timing, unlike the case you referred to, in the intervening five months, there were things that happened. Yes, they were not sexual in nature, but ---- Well, he said the last time she had made sexual advances was at the Kingfish Café. I mean, that's in the record. That's five months later. But he also testified, I believe this is in the record at 86, that the advances stopped from a sexual standpoint, but that's when the other type of harassment started. And the Court can't simply ignore all of that testimony about what happened in between when the sexual ----  I'm just trying to get a sense of the extent to which the Court had a right to ignore from the person that he charges in that five-month period. The harassment was not, at that point, sexual in nature, but there were threats. For example ---- Doesn't that go to the retaliation? I think it goes to both. It's a separate affirmative defense issue, but the issue is whether or not there's a tangible employment action. Now, what specifically? Is there something different that we're getting in this case? There's a different charge other than sexual harassment? No, there are the two claims, that he was sexually harassed and that he was retaliated against, which resulted in a constructive discharge. I'm merely saying that the fact that the harassment stopped from a sexual standpoint doesn't necessarily mean that it's not a sexual harassment. When you look at the body of case law ---- What other harassment happened after the Kingfish Cafe? She threatened him with his job. She told other people that she was the black widow and that she could F him and fire him, which he learned about, which goes to his state of mind as to whether he reasonably believed he had no other options than to quit. She told him, your number's up. She was specifically in meetings looking at him. This was the testimony of Leo Elbert. No one else, not his co-manager, Nadine Stouffer, say, I'm not the one that's going to be fired. She may have done some bad things, but the issue here really isn't her. It's whether or not there should be liability on CBS. So we start with whether or not there's a tangible employment action, and then we get into the separate affirmative defense. You still have a lawsuit against her of some type. You haven't appealed it, but you still ---- if you want to go after her, it's there. But the issue is really CBS. And as far as CBS is concerned, it stopped at that time under his own statement. It stopped. So I don't see why the separate affirmative defense doesn't apply here. I can see your arguments on separate affirmative defense, but I can't see why the separate affirmative defense doesn't apply. Maybe you could help me with that. Well, again, I just get back to that there were ---- there's a combination. There was the hostile work environment. There was the disciplinary notice that he was given that he had 30 days to improve. And then there's the constructive discharge itself, all those viewed in conjunction, I believe, were a tangible job detriment. But even if we assume that there was no tangible job detriment, the facts in the record are simply overwhelming that CBS is not entitled to the affirmative defense. They did no investigation. Well, not so much the entitlement, but that there's a tribal issue of fact. Well, Your Honor ---- There's a difference. You're on summary judgment, and your duty was to show to the trial court that there was a genuine tribal issue of fact. Now, you crossed ---- didn't you cross-move for summary judgment? We did. We moved for summary judgment on the grounds that no reasonable juror could find that CBS did ---- Right. ---- took appropriate steps. But your obligation in defeating their motion for summary judgment was to show that there was a genuine tribal issue of fact with respect to any of these issues, I guess. That's correct. Right? That's correct. Now, I would like to have you clarify one thing in the record for me, which is, as I understand it, there was only one employee handbook that sort of laid out what the policy was. Is that correct? Yes. And that policy is the sexual harassment policy that's on page 4, or in the record it was Bates number 00065. Right. Okay. And this is it. Is that correct? Yes. Okay. Was there any ---- is there anything any ---- was there any form that he was to follow, you know, to file a charging that there was a complaint of discrimination or something? Well, under their policy ---- How did this ---- how do you understand this policy was to work? The way I understand the policy is to work is that once CBS is on notice through management of a sexual harassment complaint, they will then do an investigation. Their own policy says they will do an investigation. CBS was on notice in numerous ways. Number one, Patty Dean was on notice of the sexual harassment. Mr. Hartage testified that he told Patty Dean 10 to 12 times about her behavior and that he understood. But Patty Dean knew it was sexual harassment. That was nowhere to be found in the district court's statement of facts. Did an employee waive all of this? No. And just say, you know, look, just say, you know, I'll take care of this. Here's the problem, you know, but I don't want you to investigate. I'll take care of it. I'll take care of the problem. I'll deal with it my own way. No, and then there are cases on that. Why not? Because the law requires the employer to prevent sexual harassment. Title VII is a remedial statute. It's not just to correct sexual harassment that has already occurred. It's to prevent sexual harassment that may occur in the future. And there's a wealth of cases on that. Malik v. Carrier Corporation, the failure to investigate alone allowed the jury to impose liability on the employer. The employer alone is the one that can halt such practices, and that's an essential aspect of the remedial scheme. That's D.C. Circuit, Vincent v. Taylor. In Kohler v. Centertel, the Ninth Circuit gave a roadmap as to what a reasonable investigation is. In that case, even though the employee had never told anyone she'd been sexually harassed before she quit, the first notice the company got was when she filed an EEOC charge. The company hired a third-party investigator, a neutral person, wrote to the victim, offered her her job back with a different supervisor, interviewed six people, including the harasser, didn't find sexual harassment but still trained the entire workforce, went over the sexual harassment policy with the harasser, told the harasser that some of his voicemail messages, although they weren't sexual in nature, were inappropriate. And because of all that, the court said that is an appropriate investigation. Do you think CBS treated Mr. Hardidge differently because he was a man? Pardon me? Do you think CBS treated the Mr. What's-his-name, the fellow's name, Mr. Falcone, treated this differently because the complaint was coming from a man? Yes, Your Honor, I do. That's the only reasonable explanation. I think the jury was entitled to hear evidence to that effect. Because Mr. Falcone, no question, is a very sophisticated, knowledgeable employment director for CBS at a fairly high level. And he's published articles and he testified in his deposition that normally when he's put on notice of sexual harassment, even something that in his words were arguably sexual harassment, he would do an investigation, he would meet with the harasser, he would speak with all the parties. Here, he did not even deign to tell Ms. Sparks that she was the subject of a sexual harassment complaint. He completely let it drop. So, yes, I think the fact that Mr. Hardidge was a man played into it, that there was this assumption that Mr. Hardidge could somehow deal with it on his own. And that in combination with Mr. Hardidge's testimony that he was intimidated, that he was very nervous, that he prided himself on being able to handle business matters on his own, all led to this situation where Mr. Falcone's suggestion that Mr. Hardidge handle it on his own is one that he took him up on. And as a matter of equitable estoppel, CBS can't now argue that an option that it gave to Mr. Hardidge is something that it should be entitled to use as an affirmative defense to liability in this case. Thank you. Good morning. My name is Harry Correll, and I represent Kathy Sparks and the corporate defendants, CBS, Viacom, and KSTW. First, I do want to remind the Court that Kathy Sparks and CBS categorically deny anything inappropriate happened, and that there was any allegation that I realize at this point in proceedings that is not as material as some other arguments. The district judge correctly determined that CBS was not vicariously liable for the conduct that Mr. Hardidge complains of, because it is undisputed that Mr. Hardidge unreasonably failed to take advantage of the mechanisms that CBS made available. Before you're jumping over the first issue, would you mind hitting that one first? Which one's that, Your Honor? Well, we don't get to the separate affirmative defense until we're confident that the separate affirmative defense applies. I understand. The adversary was indicating that there was no tangible employment action. I understand. I will. I'll speak to that right away. The argument that Ms. Kilbreth, on behalf of her client, Mr. Hardidge, makes is that CBS is somehow denied its opportunity to present its affirmative defenses under Farragher and Ehlers because Mr. Hardidge quit. And she claims that he quit because it was really a constructive discharge. The Souters case, which was decided after this case was briefed, but before argument, and we both submitted letters on this issue, the Souters case establishes that sometimes a constructive discharge will deprive an employer of the opportunity to use the defense, and sometimes it will not. Those cases in which Souters does prevent the employer from using the constructive discharge must show that there was a tangible job detriment as part of the constructive discharge. The harasser has to have done something like a demotion, a termination, a transfer, a reduction in job responsibility, something tangible that converts an otherwise harassment-based constructive discharge into a tangible job action. Plaintiffs simply cannot meet the burden of showing either that there was a tangible job action or that he was constructively discharged. The record before the district court on that issue, Your Honor, one, shows that the conditions were not so intolerable, repulsive, or abusive that a reasonable person would be compelled to resign. They have to clear that hurdle first. That it's tangible job action or no, they have to clear the hurdle that there was a constructive discharge. Wasn't he, in effect, put on probation for 30 days? He was not, Your Honor. And I implore the Court to review that memorandum. It is in the record. The memorandum says to Mr. Hartage, and I'm curious. 30 days to shape up. Correct. Well, or failure to see significant improvement could result in your termination. That's exactly what it said, Your Honor. Well, you can call it probation. You can call it a widget. You can call it whatever you want. Why isn't that functionally probation, whatever you call it? Well, Your Honor, for a couple of reasons. First of all, for the tangible job action to matter, plaintiffs have to establish a causal connection between that and the harassment. Well, that's a different story. Whether they had a good reason for doing this is another question. Well, actually, I disagree, Your Honor, because it is not a tangible job action for purposes of this analysis if there's no evidence that it was problematic, if there's no evidence that it was connected to the harassment. And here. I mean, if they fired him, for example, for a good reason, that would be a tangible job action. He'd still have to show causation. And the cases are clear. Right. But that's, well, we're beating around the bush. Okay. But back to the question that Your Honor asked, isn't it some kind of tangible job action? We cited cases to the Court that explain, I think it was a Seventh Circuit case, the Sweeney v. West case, that even if you have threats of discipline, if things don't improve, that doesn't constitute a tangible job action. And in this case, Mr. Hartage admitted two important things. One, that the performance issues that were being addressed in that memorandum were true, and that his co-manager, Nadine Stauffer, had also received the very same kinds of counseling meetings and memorandum. And, two, he admitted he was insubordinate. He did not do specifically what he had been told to do, which is to return to work after a particular sales function. Because of these problems, they needed to make sure they had people in the office. He admitted that that was true. It's hard to see how any trial judge could think in the record that that document creates a tangible job action that is connected with the alleged harassment, which is required under the cases, under those circumstances. So in our view, one, it doesn't rise to the level of a tangible job action, because nothing bad happened to him. He was simply warned that he needed to improve. And Mr. Hartage also testified that he met weekly with Nadine Stauffer and Ms. Stauffer or, I'm sorry, with Patty Dean, and Patty Dean told him weekly his job was not in jeopardy. He was simply a performance counselor. And Ms. Dean told him that, why don't you just go ahead and have an affair with her? Maybe it will put her in a better mood. That is what Mr. Hartage alleges. What significance do we attach to that? Well, Your Honor, that goes to the argument that Mr. Hartage makes, which is that despite his admitted failure to report sexual harassment, and in the course of 24 hours after speaking with Ms. Dean, he spoke to Ms. Dean, he spoke to Ray Radjuski, and he spoke to Paul Falcone. And in no time did he tell any one of those people that Kathy Sparks had done anything inappropriate. He met with him for 20 minutes in the car. He never said that she did anything inappropriate. And Mr. Hartage had a follow-up conversation with Falcone, and again, he misled him about what he claims was going on. So to get around that, what Mr. Hartage now claims is that Patty Dean must have known that I was feeling harassed, and that that puts CVS on notice. That is their argument. It's simply not supported by the record. Well, it's supported by his testimony, isn't it? Well, there's testimony in their testimony. There's vague testimony. If we take it as true that Patty Dean told this to Hartage, what do we do with that? Well, Your Honor, I think you need to look at, one, the entire testimony. Mr. Hartage says things like, I told Patty Dean a lot, or Patty Dean knew because she saw it. But when you press him in the deposition and you say, tell me when, tell me who was there, tell me what was said, you can't get an answer, because he simply doesn't have the foundation necessary to establish this as a fact for purposes of summary judgment. Didn't he say she specifically said, why don't you just go ahead and do it? Maybe it will put her in a better mood? He did, Your Honor. And I think that the way this Court should deal with it is the same way that the entire record. The record in front of Judge Kunau was that Mr. Hartage is not someone who observed normal professional boundaries. I mean, keep in mind, he's asking the Court to take, you know, friendly comments between himself and Ms. Dean and to put her on notice that he felt harassed. And what the district court did is looked at the record. And the record shows that Plaintiff viewed his relationship with Ms. Barks as friendly. He invited her to social events, including the Easter festivities, and he invited her to Peso's bar after the Mariners game, some six months later. At page 606. Is there a material fact and dispute of whether or not Patty actually told him to go have sex with Ms. Barks? Your Honor, no. That may be a disputed fact. Our contention is that it's not material. Patty Dean denies it. And Mr. Hartage alleges it. So it is in dispute. Correct. But we have to resolve that in favor of the party who's resisting. That's right. That's right, Your Honor. And so we have before us in the mix that, in fact, we have to assume that his supervisor told him to go have sex with Sparks, and that that will help the situation. Well, the testimony And Judge Silverman asked the question, I think promptly, one they need to answer. What do we do with that fact that we have to accept, that here's some counsel coming from a person above you to go have sex with Sparks? Well, there's no testimony that that was advice that Ms. Dean was giving Mr. Hartage. Mr. Hartage's testimony is that he had a playful banter with everybody. His testimony was he had an ongoing joking relationship with Patty Dean about this flirtation that went on between Mr. Hartage and Ms. Barks. That's what's in the record. Well, you're explaining it away, and that would be fine if we had a trial. I'm sorry, Your Honor. We don't have a trial. I'm sorry, Your Honor. Let Judge Wallace finish. Don't we have to accept the fact, don't we have to accept it as a fact for our purpose that, in fact, she told this to him? Oh, yes, absolutely. But you have to accept this fact that she said it to him in the course of a joking relationship between the two of them, because that is what Mr. Hartage testified. He didn't testify he was given advice from a supervisor about how to resolve a difficult situation, go sleep with your boss. The comment was, just sleep with her and get it over with, as part of a joking relationship that turned in part on Mr. Hartage's admitted flirtatious relationship with Ms. Barks. So what you're saying is that we can't accept this as counseling that's coming from your supervisor. We accept it as banter? That's what he testified that it was. Your Honor, it's really important here. Did he testify that that comment was banter? Yes. He testified that he had an ongoing joke with Ms. Dean about the Sparks flirtation. The other things that he testified to, and this – I don't say these things simply to, you know, to paint Mr. Hartage with a bad brush, but simply to show what the district court had in front of it in deciding whether or not Ms. Dean should have been on notice that Hartage felt harassed, because that's what he has to show. Do you think that's a factual dispute, the fact of notice? It is a factual question. The issue is whether there's evidence of harassment. How could the district court on this record, how could the district court conclude as a matter of – that there was no factual dispute? Well, because if that were the test, there would never be summary judgment in any case. The issue is – It's not very hard to show a genuine tribal issue of that. I – we challenge plaintiffs to point to the places in the record where it was, and our view, they couldn't, and the Court's view. Mr. Hartage describes himself for the Court in the deposition as a flirtatious person by nature. He engaged in sexual banter with his coworkers. He drank and smoked marijuana with his subordinates. He dated his coworkers and subordinates. He slept with his coworkers and subordinates. His sex life was a common topic of conversation and joking at work. That's at the record page 630, 833, 887, 896. He said in his deposition his relationship with Cassie Sparks was characterized by playful banter and laughs, and he said at page 94, there was playful banter from the get-go. He referred to Ms. Sparks in front of Ms. Dean by pet names such as Sparkalicious, Ms. Sparky, Baskin-Robbins, 32nd Flavor. Comment on how he – If he ever gets to a jury, that all might be relevant as to whether or not there was a hostile work environment. Well, but the question – But you prevailed on summary judgment, basically, on the affirmative defense. That's right. And the question now is whether there's a genuine tribal issue, assuming that there are no tangible action, that whether there's a tribal issue of fact with respect to this affirmative defense that CBS has. There's two prongs to the defense, as we all know. That's right. And of the first prong, we know that CBS had a policy. And I would like you to explain to me how this policy was implemented with his complaint. Okay. I'll try to address it. I think there are two points. One piece of testimony we haven't talked about. That's Mr. Hart. No, no, no. You might pull the microphone just a little closer to you. You can just jump to this. The question was how is the policy implemented? Yeah. But the policy – It was a policy, right? Correct. And we've got a – Right. I have it right here, too. I have it right here in front of me. It's Excerpt to Record 184. The policy – And there's no dispute here, I think. I think Mr. Hardidge testified that he was familiar with the policy because he was a manager. And he trained people on it and they watched the videos and – Right. Correct. So we know that there was a policy. Now, I want you to explain to me how Falcone implemented this policy. Well, according to the policy, Mr. Hardidge was supposed to report something to Human Resources. That's what the policy says. Right. He didn't do that. He said to Patty Dean, hey, Kathy – She did it for him, then. She called Human Resources. That's right. Well, she called the Executive Vice President, who then called Human Resources, who then met with Mr. Hardidge. And Mr. Falcone sat down with Mr. Hardidge and said, so, I hear you've got a concern. What's up? And Mr. Hardidge says, I'm being sexually harassed? No. Does he say my manager is touching me inappropriately? No. What does he say? He says, Kathy Sparks has developed feelings for me. I'm not sure I reciprocate them. She's made sexual advances to me, and I'm uncomfortable. Why isn't that enough? Well, because of what happens next. And both Mr. Hardidge – Why isn't that enough under the policy? Well – Why isn't that a complaint? It is raising a concern. But then Mr. Falcone says, and Mr. Hardidge admits, tell me what – I've got to understand what you mean. Has she done anything inappropriate? Has she touched you in any way? Has she done anything that makes it difficult for you to do your job? Is this harassment, in essence? And Hardidge says, no, no, no. It's nothing like that. At least not yet. All it is now is she's got feelings for me. I'm not sure what to do about it. And then he says, okay, people at work sometimes have feelings for each other. We've got a couple ways we can deal with it. I can ride in on my horse and solve the problem. You can just ignore it, but I don't advise that, because in these situations, things usually don't just go away by themselves. Or you can say something to Kathy yourself first. He chooses the third option. Now, Ms. Kilbride's argument is, as a matter of law, that is insufficient. But all of the case law seems to suggest that. Yes, if you assume there was a complaint of sexual harassment. Well, let me ask you, why wasn't that a complaint of sexual harassment? That was his policy. Because he specifically denied that that's what it was. What else is a company supposed to do? An employee comes to you and says, I've got a problem with my manager. I'm feeling uncomfortable. Tell me about the problem. Well, I don't really like the way the manager is treating me. Well, do you feel it's discriminatory? Is it harassing? Is it a problem? No, no, no, nothing like that. It's just a little uncomfortable. Well, the policy says, following a complaint, a thorough investigation will be made by interviewing the individuals involved, I guess. Your Honor, it assumes a complaint of sexual harassment was made, and it simply wasn't. He raised a concern about Ms. Sparks, but he denied harassment. Following a complaint, a thorough investigation will be made by interviewing the individuals allegedly responsible for the harassment and any witnesses. After the investigation, blah, blah, blah. That's right. And if Mr. Hartage had said, I'm feeling sexually harassed, she's behaving inappropriately, she's touching me, all of those things would have happened. Now, suppose a woman had come and made the same statement. Do you think that CBS would have responded this way? It would be speculation on my part, Your Honor, but my guess is Mr. Falcone would have said, well, tell me, has he done anything wrong? Has he touched you? Has he made, you know, has he done anything that constitutes sexual harassment? Has he affected your ability to do your job? Oh, no, no, no, no. Just, I think he may have developed feelings for me. I'm a little uncomfortable with that. Let me ask you this. In this circumstance, why isn't CBS just putting the burden on Mr. Falcone to resolve the problem or Mr. Hartage to resolve the problem? Because he insisted on it. And if you take a look at the testimony that he gave about the Kingfish restaurant. Let me ask you, in light of the – in light of this policy, was that a reasonable thing for CBS to do? Well, I think it was, Your Honor, because Mr. Hartage is the one who has all the information. And he misled everybody about what he said he was complaining about. He told – he told Patty Dean that he was uncomfortable by some things that she had done at dinner. He told Mr. Radjuski nothing. And he affirmatively told Mr. Falcone that he was not talking about harassment and did not want the company to get involved. At this point, it was just his feeling a little uncomfortable. And he testified at the Kingfish restaurant five months later when he felt that someone might have leaked it to Ms. Sparks, that he had raised a concern about her. He says, I felt like my trust had possibly been violated by corporate and leaking information because I stated I wanted to handle the case on my own. That's in April of 2001. I understand that. But at page 29 of your appellant's brief, it suggested that Dean had adequate opportunity to see what was going on on a daily basis in the workplace and that that should have triggered the CBS policy because of that. What's your response? Your Honor, my response is that the record in front of the district court showed that Mr. Hardidge had a friendly, loose, casual, and sometimes sex-based relationship with loads of people at work. He flirted with Ms. Sparks. He used pet names with Ms. Sparks. And he had running jokes with people about his sex life. Under that background, and Mr. Hardidge cannot point to a specific incident in which he complains to Ms. Dean, but against that background, I submit the district judge appropriately found there was no question of fact about whether Ms. Dean knew that Mr. Hardidge was uncomfortable or knew that Mr. Hardidge felt harassed. She may have seen the banter, but Mr. Hardidge testified himself that it was friendly banter that characterized their initiation from the get-go. He liked it. And there was nothing in the record to put Ms. Dean on notice that something was wrong. And as soon as there was, she took quick action. There's no question that Dean, as a supervisor, had responsibility to act if, in fact, she observed inappropriate sexual harassment. That's correct. I have just two minutes left, Your Honor. And I think I've covered most of the points that I had intended to raise with you. The ‑‑ I want to address briefly the question that Judge Pai has asked opposing counsel about her motion for summary judgment. There is a cross motion for summary judgment. At that point, you flip all of the presumptions and all of the inferences from the evidence. But the district court granted your motion for summary judgment. Correct. And I believe that's an issue that's appealing. And she's appealing that. It flips all the assumptions. And at that circumstance, and all of these factual inferences, if there are sufficient to create questions, run in CBS's favor. And there's simply no question that motion gets denied for that reason and because it was a request for an advisory opinion. The suggestion that counsel made at the close that there's some estoppel argument is sort of an odd one. It was raised for the first time in their reply briefs. We haven't had a chance to brief it. But I think the argument is because CBS did what Mr. Hart has asked, which is don't step in here just yet, somehow CBS is barred from raising the affirmative defense. In closing, all of Plaintiff's cases and the entire analysis turns on the assumption that what Mr. Hartage did was complain about sexual harassment. Every one of the cases turns on that. And the entire argument turns on it. And it is our position that if the Court looks at the record, reads the testimony from Mr. Falcone, which is perfectly consistent with the testimony of Mr. Hartage, he had ample opportunity to raise his concerns with Mr. Falcone and the company and he never did it. When he was asked, he denied it. When Mr. Falcone called him to follow up two weeks later, he didn't say anything about it at that point. CBS did everything a company could do given the information that Mr. Hartage was willing to share with them. We would not be here, opposing counsel suggests, if Mr. Falcone had fired Kathy Sparks. I suggest we would not be here if Mr. Hartage had told Mr. Falcone what he claimed was really going on. There would have been an investigation. That's all we have, Your Honor. Thank you. Thank you, Mr. Carroll. Ms. Gilbreth, you have a few seconds left. Mr. Hartage told Mr. Falcone, quote, sexual advances had been made that I was uncomfortable with. That's in the record at 78. Quote, Kathy had made unwanted sexual advances that had been denied. That's in the record at 335. Patty Dean knew about the sexual advances. That's at 228. She saw Kathy Sparks put her foot in his crotch. That's at 337. If you do it, I don't want to know about it. That's also at 337. The record is replete with evidence from Mr. Hartage that he complained of sexual harassment and CBS was on notice. Mr. Carroll said that the Patty Dean statement, why don't you just go ahead and do it? Maybe it would put her in a better mood. At that point, at ER 337 in the record is where it's cited. He says that Hartage then went ahead and said that this was all understood to be playful banter. It wasn't understood as advice on how to handle the situation. No, what he testified to in the record is that Patty Dean made a mockery of it. That's at 358, that what she did was view it all as just kind of banter between friends. I mean, fortunately for Mr. Hartage, the law doesn't prevent him from being a sexual harassment complaint against a boss who had a position of power over him because he engaged in banter with coworkers, totally separate. And we also have a court order prohibiting that kind of evidence from coming in at trial. So it's just a completely different situation. The fact that Patty Dean viewed it as one that she didn't need to act upon because of her assumptions about Mr. Hartage I think are largely irrelevant. Did Hartage say he understood that comment from Dean to be a joke or part of the banter? No, what he understood was that Patty Dean never took him seriously, that she thought it was just joking and part of the banter. But he also said, I know I gave Ms. Dean enough information that she knew it was sexual harassment and that it was going to be I want to file a complaint. That's in the record at 356. Did the Patty Dean comment occur before or after Falcone showed up? Before. He testified he complained to Patty Dean at least 10 to 12 times before he ever made the final, what I'll call the formal complaint, because it's the one that CBS acknowledges, and that was after the murder. Patty Dean said about go ahead and do it. Then Falcone comes on the scene and invites the complaint, invites Hartage. Yes, Your Honor. Once Mr. Falcone came on the scene, Patty Dean had no further involvement. Gotcha. Thank you, Ms. Kilgore. Mr. Correll, thank you, too. The case just argued is submitted. Good morning. The next case is 0335934, James v. C-Tran.
judges: Wallace, Silverman, Paez